**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IVELISSE G. RODRIGUEZ and WILFREDO RODRIGUEZ, individually and on behalf of the classes defined herein, | ) ) ) ) ) | ```FILED: MARCH 25, 2008``` <br> ```08CV1723     TC``` <br> ```JUDGE COAR``` <br> ```MAGISTRATE JUDGE MASON``` |
| plaintiffs, | ) ) | |
| vs. | ) ) | |
| CAPITAL ONE HOME LOANS, LLC; HSBC MORTGAGE SERVICES, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS; and DOES 1-5, | ) ) ) ) ) | |
| Defendants. | ) ) ) | **JURY DEMAND** |

<u>**COMPLAINT - CLASS ACTION**</u>

<u>**INTRODUCTION**</u>

1.      Plaintiffs, on behalf of themselves and the classes defined below, bring

this action for rescission of a "subprime" mortgage loan and damages for multiple violations of

the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and implementing Federal Reserve

Board Regulation Z, 12 C.F.R. part 226.  Plaintiffs also sue for statutory damages for violations

of the Illinois Interest Act, 815 ILCS 205/4(2)(a).

<u>**JURISDICTION AND VENUE**</u>

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

(general federal question), 1337 (interstate commerce), 15 U.S.C. §1640 (TILA) and 1367

(supplementary jurisdiction).

3.      Defendants transact business in the District and are deemed to reside here.

## PARTIES

4.      Plaintiffs Ivelisse and Wilfredo Rodriguez own and reside in a home with their four daughters at 4618 West Dickens Avenue, Chicago, Illinois, 60439.  They are high-school educated, ordinary consumers.

5.      Defendant Capital One Home Loans, LLC ("Capital One"), is a corporation with offices located at 7311 West 132nd Street, Suite 300, Overland Park, Kansas, 66213.  On information and belief, it is headquartered in McLean, Virginia.  Capital One is engaged in the business of originating sub-prime, residential mortgage loans.  It does business in Illinois.  In 2006, it made more than 26 loans per year.

6.      Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation that holds title to mortgages, as nominee.  It does business in Illinois.  Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois, 60604.

7.      Defendant HSBC Mortgage Services, Inc. ("HSBC"), is a Delaware Corporation that is engaged in the business of purchasing, holding and servicing sub-prime residential mortgage loans.  It does business in Illinois.  Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, IL, 60604.

8.      HSBC is the current servicer of plaintiffs' loan.  On information and belief, HSBC is also the legal and/or beneficial owner of plaintiffs' loan.

9.      If HSBC is not the owner of plaintiffs' loan, the current actual owner(s) is/are named as Does 1-5.

## FACTS COMMON TO ALL COUNTS

10.     Prior to January, 2006, plaintiffs had a credit card account with a Capital One affiliate.  On one of the monthly statements that plaintiffs received was an advertisement for account holders to refinance their homes with Capital One.  On information and belief, the advertisement mentioned a 5.5% interest rate and indicated that plaintiffs had been "pre-approved" for mortgage refinancing.

11.     When Ivelisse Rodriguez called the phone number given on the account statement on or about January 5, 2006, she reached Ben Jacobs at Capital One, who promised her that he could consolidate and pay off she and her husband's debts and "save them money" on a refinance.

12.     In that conversation, Jacobs took plaintiffs' financial information as well as, on information and belief, ran plaintiffs' credit profiles, then told Mrs. Rodriguez that she and her husband qualified for a loan. At Jacobs' request, plaintiffs later sent documents verifying their income along with a signed authorization to release information.

13.     On information and belief, Jacobs completed plaintiffs' computerized loan application over the phone during the initial conversation.

14.     On or about January 5, 2006, Capital One mailed plaintiffs a package containing preliminary disclosures for a loan.

15.     Although the form cover letter in the package (Exhibit A) listed the Consumer Handbook on Adjustable Rate Mortgages as being "attached," in actuality that handbook was not enclosed in plaintiffs' package.

16.     Plaintiffs needed and used the loan for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

3

17.    The loan was closed on or about January 18, 2006.  At that time, plaintiffs jointly owned the home, and both signed the new mortgage, which was in favor of MERS (Exhibit B).

18.    "Closing" occurred as follows.  Plaintiffs received, via Express Mail or other overnight courier, a single set of closing documents with instructions to sign them, take specified ones to a notary for notarization (Exhibit C), and send the signed documents back to Capital One via overnight courier.  Plaintiffs followed these and other Capital One, written instructions.

19.    No second or duplicate set of closing documents was included in the overnight package for plaintiffs to review and keep for their records.  Referring to these two documents, another written instruction sheet from Capital One told plaintiffs to "retain" the HUD-1 Settlement Statement and a copy of the note (Exhibit D).  The instruction stated that "these are the primary documents of your closing package" and that "you may need to reference these documents" in the future.  In order to view or obtain copies of any other closing documents, plaintiffs had to access Capital One's website within 90 days.

20.    However, only one copy of the note, i.e., the copy plaintiffs were instructed to sign and return, was actually enclosed in the package.  A third, written instruction sheet from Capital One, conflicting with the second, informed plaintiffs that "the note will be forwarded by your loan officer" (Exhibit E).

21.    In fact, plaintiffs never received a copy of their note and, to this day, do not fully know or understand the structure and terms of the loan program Capital One put them in.  On information and belief, plaintiffs have a three-and-a-half year, adjustable rate, interest-

only loan with an initial interest rate of 8.99% and an initial Annual Percentage Rate ("APR") of 10.76%.

22.     Plaintiffs had web access at the time they obtained the loan but lost it thereafter.  Plaintiffs recently tried to access their closing documents on Capital One's website but were no longer allowed access (Exhibit F).

23.     Besides a truncated copy of a HUD-1 (Exhibit G), a minimum of three pages of instructions from Capital One (Exhibits C, D and E), and a copy of the ARM Handbook (Exhibit H), plaintiffs retained only one other document from the closing package they received, namely, a single, executed copy of a federal Notice of Right to Cancel form (Exhibit I).

24.     Among other documents that were not provided to plaintiffs in a form they could keep was a final TILA Disclosure Statement.

25.     Capital One made plaintiffs a $351,000 loan.  On information and belief, the loan amount was 100% of the value of plaintiffs' home.  In the alternative, Capital One inflated the appraised value of plaintiffs' home.  At this time, plaintiffs do not have the documents that would indicate how much Capital One or its agent appraised their home for.

26.     On information and belief, Capital One gave plaintiffs a loan with a higher interest rate and a higher monthly payment amount than plaintiffs' previous loan.

27.     In addition, plaintiffs later learned through HSBC that Capital One put a three-year prepayment penalty.  At plaintiffs' request, HSBC faxed a copy of the first page of the Prepayment Penalty Note Rider (Exhibit J).

28.     On information and belief, plaintiffs' interest rate is scheduled to enter its adjustable phase next year.  Plaintiffs have struggled to afford the mortgage payment and will

certainly be unable to afford the higher payment amounts once the interest rate starts increasing. At present, plaintiffs are current on their payments.

29.     In March, 2006, Capital One notified plaintiffs that it had assigned the servicing rights to the loan to HSBC (<u>Exhibit K</u>).  As a servicer, HSBC claims certain rights in the loan, including the right to receive payments, to report to credit bureaus and to pursue foreclosure as a means of enforcing payment.  HSBC is, therefore, joined as a necessary party.

30.     On information and belief, HSBC also owns plaintiffs' loan (<u>Exhibit L</u>).

31.     In the event HSBC does not own plaintiffs' loan, the actual owner(s) is/are named as Does 1-5.  Actual ownership is not a matter of public record.

32.     As the holder of title to the mortgage that resulted from the transaction, MERS also claims certain rights in plaintiffs' loan, including the rights to transfer interests in, and to foreclose on, the mortgage.  Therefore, MERS is joined as a necessary party.

33.     Plaintiffs may amend or add allegations and/or legal claims to their complaint once they receive, through discovery, a complete set of the closing documents they signed for the loan.  At present, these and other documents are in defendants' sole possession and control.

## <u>COUNT I – TRUTH IN LENDING ACT – INDIVIDUAL CLAIM</u>

34.     Plaintiffs incorporate paragraphs 1-33.  This count is against all defendants.  MERS is a necessary party.

## <u>RIGHT TO RESCIND</u>

35.     Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to

the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23

provides:

> **(a) <u>Consumer's right to rescind.</u>**
>
> > **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**
> >
> > **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**
> >
> > **(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]**
> >
> > **(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.**
>
> **(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:**
>
> > **(1) The retention or acquisition of a security interest in the consumer's principal dwelling.**
> >
> > **(2) The consumer's right to rescind the transaction.**
> >
> > **(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.**

**(4) The effects of rescission, as described in paragraph (d) of this section.**

**(5) The date the rescission period expires. . . .**

**(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:**

**(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].**

**(2) A credit plan in which a state agency is a creditor.**

## <u>GROUNDS FOR RESCISSION</u>

36.    In connection with the loan, Capital One failed to provide the required financial disclosures, in violation of 15 U.S.C. Sect. 1637, 12 C.F.R. Sect. 226.18 and the corresponding sections of the Official Federal Reserve Board ("FRB") Commentary on Regulation Z, and failed to provide clear and conspicuous notice of plaintiffs' federal right to rescind the loan.

37.    Regulation Z specifically requires that these disclosures be provided to the consumer in a form that he or she can keep.  This applies to transactions any part of which are conducted electronically.

38.    Capital One did not provide plaintiffs with a final TILA Disclosure Statement in a form that they could keep.

39.    Capital One provided plaintiffs with only one federal Notice of Right to Cancel in a form that they could keep (<u>Exhibit I</u>), instead of the four required (i.e., two per mortgagor) by Sect. 226.23(b) (see above).

40.    In addition, the single, paper copy of the federal Notice of Right to Cancel provided to plaintiffs (Exhibit I) was provided using the wrong form, the Federal Reserve Board's H9 form, which is appropriate only when an existing or immediately prior mortgage creditor is providing additional or "increased" credit to the consumer.  Capital One was a new mortgage creditor vis-à-vis plaintiffs, and, therefore, the H8 was the appropriate model form. The H9 was misleading in this context because it states that plaintiffs could only rescind the "increase of credit" when, in fact, they could rescind the entire extension of credit.

41.    Further, the TILA Disclosures and Notice of Right to Cancel were all obfuscated and otherwise rendered less than clear and conspicuous by the combination of Capitol One's (a) failure to provide plaintiffs with copies of them in a form they could keep and (b) its instructions to plaintiffs that "the primary loan documents" were the note and the HUD-1 Settlement Statement, i.e., not the TILA Disclosures (Exhibit D).  In fact, retained TILA Disclosures and Notice of Right to Cancel forms are crucial to the consumers' understanding of the terms of the credit transaction and to their ability to effectively exercise their rights.

42.    Any one of these violations alone entitles plaintiffs to rescind the loan.

43.    Notices of rescission were sent to all defendants on March 22, 2008 (Exhibit M).

44.    The loan has not been rescinded.

45.    Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee."

46.    In addition, 15 U.S.C. Sect. 1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b.    Refund of all finance charges, as required by TILA rescission;

c.    Statutory damages for failure to rescind, if appropriate;

d.    Attorney's fees, litigation expenses and costs; and

e.    Such other or further relief as the Court deems appropriate.

## COUNT II – TRUTH IN LENDING ACT – CLASS CLAIMS

47.    Plaintiffs incorporate paragraphs 1-46.  This count is against all defendants.  MERS is a necessary party.

48.    Capital One regularly closed residential mortgage refinancing transactions in the manner described above without providing consumers, in a form that they could keep, with (a) the TILA Disclosure Statement or (b) the requisite number of Notice of Right to Cancel forms, (c) while at the same time instructing consumers that "the primary loan documents" were the HUD-1 Settlement Statement and the Note, i.e., not the TILA disclosures.  The instruction sheet in Exhibit D is a standard form document, used by Capital One in thousands of "ghost" closings.

49.     Failing to provide either of these disclosures in a form that the consumer can keep, and suggesting to the consumer that these disclosures are not "primary" to the transaction, violates TILA, Regulation Z and the Official FRB Commentary on Regulation Z.

50.     In addition, on information and belief Capital One frequently used the H9 form in credit situations that called for the H9.  Capital One's H9 (Exhibit I) form is a standard form document.

51.     Use of the wrong model rescission form violates TILA, Regulation Z and the FRB Commentary.

## CLASS ALLEGATIONS

52.     Plaintiffs sue on their own behalf and on behalf of two classes, A and B. Class A consists of (a) all natural persons with Illinois, Indiana and Michigan residences; (b) who entered into a residential mortgage credit transaction with Capital One; (c) in which Capital One did not provide the TILA Disclosure Statement, the required number of federal Notices of Right to Cancel or both in a form that the consumer could keep; (d) in which Capital One provided an instruction that the "primary closing documents" were the HUD-1 and the note; and (d) the loan was closed on or after a date three years prior to the filing of this action.

53.     Class B consists of (a) all natural persons with Illinois, Indiana and Michigan residences who (b) entered into a residential mortgage credit transaction with Capital One (c) in which Capital One provided the H9 model rescission form when the transaction was not one in which the consumers' previous creditor was providing additional credit and (d) the loan was closed on or after a date three years prior to the filing of this action.

54.     The classes are so numerous that joinder is impracticable.  Plaintiffs do not know at present the exact size of the proposed classes or the identities of the proposed class

members, since such information is in the sole possession and control of defendants. But plaintiffs believe that each class encompasses several thousand individuals. On information and belief, there are more than 50 members of each class.

55.    There are questions of law and fact common to the members of the classes, which common questions predominate over any questions that affect only individual class members. The predominant common questions include whether:

(a) Capital One regularly closed loans in the manner in which it closed plaintiffs' loan, using the same procedures and instruction sheets;

(b) Capital One's manner of providing/not providing the required TILA disclosures constitutes clear and conspicuous disclosure under TILA; and whether

(c) providing notice of the federal right to cancel using the H9 model rescission form in transactions where Capital One is a new creditor violates TILA.

56.    Plaintiffs' claims are typical of the claims of the class members and do not conflict with them in any way. All are based on the same factual and legal theories.

57.    Plaintiffs will fairly and adequately represent the interests of the class members. They are committed to the vigorous prosecution of the class claims, and they have retained counsel experienced in the prosecution of TILA cases and class actions.

58.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. A class action concerning the issues in this case does not create any problems of manageability.

59.    In the alternative, defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate the Court's rendering of corresponding declaratory relief with respect to each class as a whole.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the class and against defendants for:

a.      A declaration that class members have the right and the option to rescind, should they choose to exercise that right upon receiving proper notice;

b.      Attorney's fees, litigation expenses and costs of suit; and

c.      Such other or further relief as the Court deems proper.

## COUNT III – ILLINOIS INTEREST ACT

60.      Plaintiffs incorporate paragraphs 1-33.  This count is against Capital One.

61.      On information and belief, the note recites that it is governed by the Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C. Sect. 3802 ("AMTPA").

62.      Otherwise the note would violate  Sect. 4(2)(a) of the Illinois Interest Act, 815 ILCS 205/4(2)(a), which provides:

> **Whenever the rate of interest exceeds 8% per annum on any written contract, agreement or bond for deed providing for the installment purchase of residential real estate, or on any loan secured by a mortgage on residential real estate, it shall be unlawful to provide for a prepayment penalty or other charge for prepayment.**

63.      The AMTPA requires that loans be made in compliance with regulations issued by the Office of Thrift Supervision ("OTS"), successor to the Federal Home Loan Bank Board.  12 U.S.C. Sect. 3803(a)(3).

64.      The OTS regulations, 12 C.F.R. Sect. 560.220, condition a lender's rights under AMTPA upon compliance with 12 C.F.R. Sect. 560.210, which provides that a lender "must provide the initial disclosures described at 12 C.F.R. Sect 226.19(b) and the adjustment notices described at 12 C.F.R. Sect. 226.20(c) for variable rate transactions, as described in those regulations."

13

65.     12 C.F.R. Sect. 226.19, part of Federal Reserve Board Regulation Z,

provides:

### SECTION 226.19    Certain Residential Mortgage Transactions

**(a)     (1) <u>Time of Disclosures.</u>**

**In a residential mortgage transaction subject to the Real Estate Settlement Procedures Act (12 U.S.C. 2601, et seq.) the creditor shall make good faith estimates of the disclosures required by section 226.18 before consummation, or shall deliver or place them in the mail not later than three business days after the creditor receives the consumer's written application, whichever is earlier.**

**(2)     <u>Redisclosure required</u>.     If the annual percentage rate in the consummated transaction varies from the annual percentage rate disclosed under section 226.18(e) by more than 1/8 of 1 percentage point in a regular transaction or more than 1/4 of 1 percentage point in an irregular transaction, as defined in Section 226.22, the creditor shall disclose the changed terms no later than consummation or settlement.**

**(b)     <u>Certain variable-rate transactions.</u>[fn]45a  If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year, the following disclosures must be provided at the time an application form is provided or before the consumer pays a non-refundable fee, whichever is earlier:[fn]45b**

> **(1)     The booklet titled <u>Consumer Handbook on Adjustable Rate Mortgages</u> published by the Board and the Federal Home Loan Bank Board, or a suitable substitute.**

> **(2)     A loan program disclosure for each variable-rate program in which the consumer expresses an interest.  The following disclosures, as applicable, shall be provided:**

>> **(i)     The fact that the interest rate, payment, or term of the loan can change.**

>> **(ii)     The index or formula used in making adjustments, and a source of information about the index or formula.**

(iii)    An explanation of how the interest rate and payment will be determined, including an explanation of how the index is adjusted, such as by the addition of a margin.

(iv)    A statement that the consumer should ask about the current margin value and current interest rate.

(v)    The fact that the interest rate will be discounted, and a statement that the consumer should ask about the amount of the interest rate discount.

(vi)    The frequency of interest rate and payment changes.

(vii)    Any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover.

(viii)    An historical example, based on a $10,000 loan amount, illustrating how payments and the loan balance would have been affected by interest rate changes implemented according to the terms of the program.  The example shall be based upon index values beginning in 1977 and be updated annually until a 15-year history is shown.  Thereafter, the example shall reflect the most recent 15 years of index values.  The example shall reflect all significant loan program terms, such as negative amortization, interest rate carryover, interest rate discounts, and interest rate and payment limitations, that would have been affected by the index movement during the period.

(ix)    An explanation of how the consumer may calculate the payments for the loan amount to be borrowed based on the most recent payment shown in the historical example.

(x)    The maximum interest rate and payment for a $10,000 loan originated at the most recent interest rate shown in the historical example assuming the maximum periodic increases in rates and payments under the program; and the initial interest rate and payment for that loan.

(xi)    The fact that the loan program contains a demand feature.

(xii)    The type of information that will be provided in notices of adjustments and the timing of such notices.

15

**(xiii)   A statement that disclosure forms are available for the creditor's other variable-rate loan programs.**

**[fnn]45b  Disclosures may be delivered or placed in the mail not later than three business days following receipt of a consumer's application when the application reaches the creditor by telephone, or through an intermediary agent or broker.**

66.    For purposes of Sect. 226.19(b) above, on information and belief plaintiffs' application for mortgage credit "reached" Capital One when Jacobs took plaintiffs' information for an application on January 5, 2006, when the preliminary disclosures were mailed out.  The Consumer Handbook on Adjustable Rate Mortgages was not enclosed with the other preliminary disclosures plaintiffs received; it was not provided to plaintiffs - and plaintiffs did not receive it - at any other time prior to closing.

67.    Capital One did not provide plaintiffs with the disclosures described in Sect. 226.19 until January 18, 2006.  The booklet was included within the closing documents that plaintiffs received for signature.

68.    The 1-page "3 Year-6 Month Libor ARM Adjustable Rate Mortgage Loan Program Disclosure" that Capital One did enclose in plaintiffs' preliminary disclosure package did not disclose all of the information required.

69.    Capital One's loan to plaintiffs violated 4(2)(a) of the Illinois Interest Act, 815 ILCS 205/4(2)(a).

70.    Plaintiffs are entitled to statutory damages as provided in Sect. 6 of the Interest Act, 815 ILCS 205/6.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendant for:

       a.        Statutory damages

       b.        Attorney's fees, litigation expenses and costs of suit; and

       c.        Such other or further relief as the Court deems proper.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

## **JURY DEMAND**

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## <u>NOTICE OF LIEN</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
<u>al@alhofeldlaw.com</u>

1

08CV1723          TC
JUDGE COAR
MAGISTRATE JUDGE MASON

**EXHIBIT A**

January 5, 2006

**Capital One Home Loans, LLC**
7311 West 132nd Street, Suite 300
Overland Park, Kansas 66213
Phone 1-888-718-4488 Fax 1-888-986-2456

Ivelisse G. Rodriguez and Wilfredo Rodriguez
4618 W Dickens Avenue
Chicago, IL 60639

RE: INITIAL DISCLOSURES

Enclosed are the initial disclosures for your loan with Capital One Home Loans, LLC. Please keep these documents for your records.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR APPLYING FOR A MORTGAGE

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who applies for or obtains a mortgage account.

What this means for you: When you apply for a mortgage, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

Thank you, and if you should have any questions, please contact me at this toll free number: 1-888-718-4488, or ben.jacobs@capitalonehomeloans.com

Sincerely,

*Ben Jacobs*
*Loan Consultant*

Encl:
FACTA Notice To Home Loan Applicant
Privacy Statement
Truth-In-Lending
Good Faith Estimate
Transfer of Servicing Disclosure
Right to Receive Appraisal
Consumer Handbook on Adjustable Rate Mortgages attached. Please read.

ARM Disclosure

# EXHIBIT B

COOK COUNTY RECORDER OF DEEDS DISCLAIMER

While the Cook County Recorder of Deeds (CCRD) attempts to keep this website up to date with enabling law and policy, the CCRD does not guarantee the accuracy of any of the information contained herein, including, but not limited to, database information and document images. CCRD also does not guarantee the legality of the documents and database information contained herein and accepts no liability for any damages incurred, whether directly, indirectly, incidental, punitive or consequential, as a result of any errors, omissions or discrepancies in any information published on this website or any use of this website, including, but not limited to use of on-line terms or otherwise.

COPYRIGHT © 2007 Cook County Recorder of Deeds. All rights reserved.

Please Call 312-603-5050 if you have general information questions about the Cook County Recorder of Deeds office. At the end of the message a live operator will assist you.

MORTGAGE

MIN 100193932-2006001231-4

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive Ste 201
St. Paul, MN 55117

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    January 18, 2006, together with all Riders to this document.

(B) "Borrower" is Evelisse Rodriguez and Wilfredo Rodriguez, wife & husband,

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
2006001231
0

Prepared By:
Jenny Schatez
1211 W. 22nd Street Ste 300
Overland Park, KS 66213

Doc#: 0604212053 Fee: $64.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 02/10/2006 12:31 PM Pg. 1 of 20

EXHIBIT C

# THE ATTACHED DOCUMENTS
# MUST BE NOTARIZED:

- Deed of Trust/Mortgage
- Signature Affidavit(s)
- Affidavit as to Real Estate
- Compliance Agreement
- Correction Agreement
- Other: _____
- Other: _____
- Other: _____

# INSTRUCTIONS TO THE
# NOTARY PUBLIC:

- Please DO NOT sign as a witness.
- Please be sure your stamp and/or seal are legible and do not cover any type on the document being notarized.
- Complete the Notary Public Compliance Information document.

# EXHIBIT D

# YOUR COPIES

Please retain the following documents inside your Capital One Home Loans folder for your records:

- Settlement Statement
- Note
  - These are the primary documents of your closing package. You may need to reference these documents for future refinance or purchase transactions.

If you would like to view or print copies of your complete closing package, please visit our website at **www.capitalonehomeloans.com** and follow these instructions:

- In the right hand corner of the home page, click on "Log In".
- Enter your loan number and password. Your 10 digit loan number can be found on the first page of the Settlement Statement under item number 7. The password is the last 6 digits of your social security number.
- Click on "Log In" again.
- Follow the prompts to download and print your closing documents.

# EXHIBIT E

**THE NOTE WILL BE FORWARDED BY YOUR LOAN OFFICER**

***Capital One Settlement Services, LLC***

THANK YOU!

EXHIBIT F

Capital One Home | Find Products | Account Access | Customer Service

Enter your five-digit ZIP Code

Search

**Home Loans**

| Home Loans Home || Home Equity || Debt Consolidation || New Home Purchase || Refinance || Our Loan Consultants |

Our customers lower their payments
an average of **$140 a month** with

**View home loan application status**

**Calculators**

What's my payment?
How much can I save?
View all calculators

**Home Equity**

Cash for any reason
$0 closing cost options◊
Close in 10 days or less**

Learn about home equity loans

**Debt Consolidation**

Reduce high-interest debt
Lower your monthly payments by $140†

Learn about debt consolidation

**Home Purchase**

Dedicated loan consultants
No Hassle loan process
No origination fee options

Learn about new home purchase loans

**Refinance**

Lock in a low rate
Customized loan solutions
Less than perfect credit

Learn about refinancing

**Testimonials**

Jeff made the whole loan process very easy. He was very well informed...
–Travis S.
Read more testimonials

**No Hassle loan process**

Close your loan in ten days or less

**How can we help?**

Contact us
About Capital One Home Loans

◊ $0-closing-cost option not available with lowest rate and requires a minimum loan amount of $60,000 with a $25,000 minimum draw size for a Home Equity Line of Credit and minimum loan amount of $50,000 for a Home Equity Loan.

* Annual percentage rate effective as of 2/19/2008 and subject to change at any time. APR is based on a good credit history, $200,000 loan amount, 80% combined loan-to-value ratio, and a 30 year fixed-rate first-lien mortgage. Monthly payment for this example is $1,170. Additional terms and restrictions apply.

** 10-day claim calculated from receipt of completed application and all required supporting documentation.

† Lower average monthly payment claim based on last month's payment on non-purchase loans, exclusive of closing costs, that closed between 07/01/2007 and 12/31/2007. Actual savings vary. In some cases, refinancing to pay off existing debt may extend the term of the debt, possibly resulting in higher overall costs.

‡ Rate locks vary by product selected and are obtainable after underwriting and approval of the loan.

| CapitalOne.com | Corporate Information | Legal |
|---|---|---|
| Home | About Capital One | Privacy |
| Credit Cards | Investors | Security |
| Auto Loans | News | Terms and Conditions |
| Direct Banking | Careers | |
| Home Loans | Financial Education | Other |
| Healthcare Finance | | Capital One Canada |
| Personal Loans | | Capital One UK |
| Small Business | | Site Map |
| Commercial | | |

This site provides information about and access to financial services offered by the Capital One family of companies, including Capital One Bank (USA), N.A. and Capital One, N.A., members FDIC.
©2007 Capital One Services, Inc.
Capital One is a federally registered trademark of Capital One Services, Inc.

Capital One does not provide, endorse, nor guarantee and is not liable for third party products, services, educational tools, or other information available through this site. Read additional disclosures

Capital One Home    Find Products    Account Access    Customer Service

Enter your five-digit ZIP Code

Search

**Home Loans**

Home Loans Home | Home Equity | Debt Consolidation | New Home Purchase | Refinance | Our Loan Consultants

## Customer Login

To enter our data system, please enter your loan number and password in the fields below. If you do not know this information, call (888) 497-6278 or e-mail your loan consultant.

Loan Number

2006001231

Password

**Questions?**

Call toll-free at: (888) 497-6278

**Privacy and Security**

This site uses Secure Sockets Layer (SSL) encryption for all customer data and has been authenticated by VeriSign.

Any information you provide will remain safe, secure, and confidential.

Review our privacy policy to learn how we protect your personal information.

This site provides information about and access to financial services offered by the Capital One family of companies, including Capital One Bank (USA), N.A. and Capital One, N.A., members FDIC.
©2007 Capital One Services, Inc.
Capital One is a federally registered trademark of Capital One Services, Inc.

Capital One does not provide, endorse, nor guarantee and is not liable for third-party products, services, educational tools, or other information available through this site. Read additional disclosures.

**Customer Login**

Login not available past 30 days from date of disbursement

Loan Number 2008001231

Password

EXHIBIT C

| D. Property Location | H. Settlement Agent | I. Settlement Date |
|---|---|---|
| 4618 W. Dickens Avenue<br>Chicago, IL 60639 | Capitol One Settlement Services, LLC<br>Place of Settlement<br>12900 Foster, Suite 250<br>Overland Park, KS 66213 | closed: 01/18/06<br>disbursed: 01/23/06 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 8,527.45 | 403. | |
| 104. | | 404. | |
| 105. Existing Liens | 341,965.58 | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | 350,493.03 | 420. Gross Amount Due To Seller | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 351,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. Costs Paid by Seller | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 351,000.00 | 520. Total Reduction Amount Due Seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross Amount due from borrower (line 120) | 350,493.03 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | ( 351,000.00) | 602. Less reductions in amt. due seller (line 520) | ( ) |
| 303. Cash ☐ From ☒ To Borrower | 506.97 | 603. Cash ☐ To ☐ From Seller | 0.00 |

| | | |
|---|---|---|
| 809. | | |
| 810. | | |
| 811. Life of Loan Flood Cert. to First American Flood Data Services | 10.00 | |
| 812. Tax Service Fee to Capital One Home Loans | | |
| 813. Underwriting to Capital One Home Loans | 300.00 | |
| 814. Processing Fee to Capital One Home Loans | 250.00 | |
| 815. Doc Prep to Capital One Home Loans | 250.00 | |
| 816. Initial Flood Determinati to First American Flood Data Services | 10.00 | |
| 817. | | |
| **900. Items Required By Lender To Be Paid In Advance** | | |
| 901. Interest from 01/23/06 to 02/01/06 @$ 86.6393 /day | 778.84 | |
| 902. Mortgage Insurance Premium for months to | | |
| 903. Hazard Insurance Premium for 1 years to LIBERTY INSURANCE AGENCY | 495.00 | |
| 904. years to | | |
| 905. | | |
| **1000. Reserves Deposited With Lender** | | |
| 1001. Hazard insurance 10 months@$ 123.75 per month | 1,237.50 | |
| 1002. Mortgage insurance months@$ per month | | |
| 1003. City property taxes months@$ per month | | |
| 1004. County property taxes 7 months@$ 167.90 per month | 3,175.30 | |
| 1005. Annual assessments months@$ per month | | |
| 1006. months@$ per month | | |
| 1007. months@$ per month | | |
| 1008. months@$ per month | | |
| 1009. Aggregate adjustment | - 371.19 | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee to Capital One Settlement Services | 275.00 | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1104. Title insurance binder to Land America OneStop | 30.00 | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to | | |
| (includes above items numbers: | | |
| 1108. Title insurance to Land America OneStop | 372.00 | |
| (includes above items numbers: | | |
| 1109. Lender's coverage $ 151,000.00 Premium: 372.00 | | |
| 1110. Owner's coverage $ | | |
| 1111. Payoff Delivery Fee CAPITAL ONE SETTLEMENT SERVICES | 15.00 | |
| 1112. Express Mail Charges Capital One Settlement Services | 50.00 | |
| 1113. | | |
| **1200. Government Recording and Transfer Charges** | | |
| 1201. Recording fees: Deed $ ; Mortgage $ 120.50 ; Releases $ 40.50 | 161.00 | |
| 1202. City/county tax/stamps: Deed $ ; Mortgage $ | | |
| 1203. State tax/stamps: Deed $ ; Mortgage $ | | |
| 1204. Assignment Mortgage/DOT Capital One Home Loans | 25.00 | |
| 1205. | | |
| **1300. Additional Settlement Charges** | | |
| 1301. Survey to | | |
| 1302. Pest inspection to | | |
| 1303. | | |
| 1304. | | |
| 1305. Funding Fee Capital One Home Loans | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | 9,527.45 | |

Tuplisme Rodriguez

Wilfredo Rodriguez

EXHIBIT H

Board of Governors of the Federal Reserve



The Federal Reserve Board

Consumer Handbook on
**Adjustable Rate
Mortgages (ARM)**



The Federal Reserve Board and the Office of Thrift Supervision prepared this booklet on adjustable-rate mortgages (ARMs) in response to a request from the House Committee on Banking, Finance and Urban Affairs (currently, the Committee on Financial Services) and in consultation with many other agencies and trade and consumer groups. It is designed to help consumers understand an important and complex mortgage option available to homebuyers.

We believe a fully informed consumer is in the best position to make a sound economic choice. If you are buying a home and looking for a home loan, this booklet will provide useful basic information about ARMs. It cannot provide all the answers you will need, but we believe it is a good starting point.

# People are asking . . .

**"Some newspaper ads for home loans show surprisingly low rates. Are these loans for real, or is there a catch?"**

Some of the ads you see are for adjustable-rate mortgages (ARMs). These loans may have low rates for a short time—maybe only for the first year. After that, the rates may be adjusted on a regular basis. This means that the interest rate and the amount of the monthly payment may go up or down.

**"Will I know in advance how much my payment may go up?"**

With an adjustable-rate mortgage, your future monthly payment is uncertain. Some types of ARMs put a ceiling on your payment increase or interest-rate increase from one period to the next. Virtually all types must put a ceiling on rate increases over the life of the loan.

**"Is an ARM the right type of loan for me?"**

That depends on your financial situation and the terms of the ARM. ARMs carry risks in periods of rising interest rates, but they can be cheaper over a longer term if interest rates decline. You will be able to answer the question better once you understand more about ARMs. This booklet should help.

Mortgages have changed, and so have the questions that consumers need to ask and have answered.

Shopping for a mortgage used to be a relatively simple process. Most home mortgage loans had interest rates that did not change over the life of the loan. Choosing among these fixed-rate mortgages meant comparing interest rates, monthly payments, fees, prepayment penalties, and due-on-sale clauses.

Today, many loans have interest rates (and monthly payments) that can change from time to time. To compare one ARM with another or with a fixed-rate mortgage, you need to know about indexes, margins, discounts, caps, negative amortization, and convertibility. You need to consider the maximum amount your monthly payment could increase. Most important, you need to compare what might happen to your mortgage costs with your future ability to pay.

This booklet explains how ARMs work and some of the risks and advantages to borrowers that ARMs introduce. It discusses features that can help reduce the risks and gives some pointers about advertising and other ways you can get information from lenders. Important ARM terms are defined in a glossary on page 19. And a checklist at the end of the booklet should help you ask lenders the right questions and figure out whether an ARM is right for you. Asking lenders to fill out the checklist is a good way to get the information you need to compare mortgages.

# What is an ARM?

With a fixed-rate mortgage, the interest rate stays the same during the life of the loan. But with an ARM, the interest rate changes periodically, usually in relation to an index, and payments may go up or down accordingly.

Lenders generally charge lower initial interest rates for ARMs than for fixed-rate mortgages. This makes the ARM easier on your pocketbook at first than a fixed-rate mortgage for the same amount. It also means that you might qualify for a larger loan because lenders sometimes make the decision about whether to extend a loan on the basis of your current income and the first year's payments. Moreover, your ARM could be less expensive over a long period than a fixed-rate mortgage—for example, if interest rates remain steady or move lower.

Against these advantages, you have to weigh the risk that an increase in interest rates would lead to higher monthly payments in the future. It's a trade-off—you get a lower rate with an ARM in exchange for assuming more risk.

Here are some questions you need to consider:

- Is my income likely to rise enough to cover higher mortgage payments if interest rates go up?

- Will I be taking on other sizable debts, such as a loan for a car or school tuition, in the near future?

- How long do I plan to own this home? (If you plan to sell soon, rising interest rates may not pose the problem they do if you plan to own the house for a long time.)

- Can my payments increase even if interest rates generally do not increase?

# How ARMs Work:
# the Basic Features

## The adjustment period

With most ARMs, the interest rate and monthly payment change every year, every three years, or every five years. However, some ARMs have more frequent rate and payment changes. The period between one rate change and the next is called the "adjustment period." A loan with an adjustment period of one year is called a one-year ARM, and the interest rate can change once every year.

## The Index

Most lenders tie ARM interest-rate changes to changes in an "index rate." These indexes usually go up and down with the general movement of interest rates. If the index rate moves up, so does your mortgage rate in most circumstances, and you will probably have to make higher monthly payments. On the other hand, if the index rate goes down, your monthly payment may go down.

Lenders base ARM rates on a variety of indexes. Among the most common indexes are the rates on one-, three-, or five-year Treasury securities. Another common index is the national or regional average cost of funds to savings and loan associations. A few lenders use their own cost of funds as an index, which gives them more control than using other indexes. You should ask what index will be used and how often it changes. Also ask how it has fluctuated in the past and where it is published.

## The margin

To determine the interest rate on an ARM, lenders add to the index rate a few percentage points, called the "margin." The amount of the margin may differ from one lender to another, but it is usually constant over the life of the loan.

Index rate + margin =
ARM interest rate

Let's say, for example, that you are comparing ARMs offered by two different lenders. Both ARMs are for 30 years and have a loan amount of $65,000. (All the examples used in this booklet are based on this amount for a 30-year term. Note that the pay-ment amounts shown here do not include taxes, insurance, or similar items.)

Both lenders use the rate on one-year Treasury securities as the index. But the first lender uses a 2% margin, and the second lender uses a 3% margin. Here is how that difference in the margin would affect your initial monthly payment.

In comparing ARMs, look at both the index and margin for each program. Some indexes have higher values, but they are usually used with lower margins. Be sure to discuss the margin with your lender.

Home sale price $ 85,000
Less down payment - 20,000
Mortgage amount $ 65,000

Mortgage term 30 years

FIRST LENDER
One-year index = 8%
Margin = 2%
ARM interest rate = 10%
Monthly payment @ 10 % = $ 570.42

SECOND LENDER
One-year index = 8%
Margin = 3%
ARM interest rate = 11%
Monthly payment @ 11% = $ 619.01

# Consumer Cautions

## Discounts

Some lenders offer initial ARM rates that are lower than their "standard" ARM rates (that is, lower than the sum of the index and the margin). Such rates, called discounted rates, are often combined with large initial loan fees ("points") and with much higher rates after the discount expires.

Very large discounts are often arranged by the seller. The seller pays an amount to the lender so that the lender can give you a lower rate and lower payments early in the mortgage term. This arrangement is referred to as a "seller buydown." The seller may increase the sales price of the home to cover the cost of the buy-down.

A lender may use a low initial rate to decide whether to approve your loan, based on your ability to afford it. You should be careful to consider whether you will be able to afford payments in later years when the discount expires and the rate is adjusted. Here is how a discount might work. Let's assume that the lend-er's "standard" one-year ARM rate (index rate plus margin) is currently 10%. But your lender is offering an 8% rate for the first year. With the 8% rate, your first-year monthly payment would be $476.95.

But don't forget that with a discounted ARM, your initial pay-ment will probably remain at $476.95 for only 12 months—and that any savings during the discount period may be made up during the life of the mortgage or may be included in the price of the house. In fact, if you buy a home using this kind of loan, you run the risk of . . .

## Payment shock

Payment shock may occur if your mortgage payment rises very sharply at the first adjustment. Let's see what would happen in the second year if the rate on your discounted 8% ARM were to rise to the 11% "standard" rate.



| ARM Interest Rate | Monthly Payment |
| --- | --- |
| 1st year (w/discount) @ 8% | $ 476.95 |
| 2nd year @ 10% | $ 568.82 |

As the example shows, even if the index rate were to stay the same, your monthly payment would go up from $476.95 to $568.82 in the second year.

Suppose that the index rate increases 2% in one year and the ARM rate rises to 12%.

| ARM Interest Rate | Monthly Payment |
| --- | --- |
| 1st year (w/discount) @ 8% | $ 476.95 |
| 2nd year @ 12% | $ 665.43 |

That's an increase of almost $200 in your monthly payment. You can see what might happen if you choose an ARM because of a low initial rate. You can protect yourself from large increases by looking for a mortgage with features, described next, that may reduce this risk.

# How Can I Reduce My Risk?

Besides offering an overall rate ceiling, most ARMs also have "caps" that protect borrowers from extreme increases in monthly payments. Others allow borrowers to convert an ARM to a fixed-rate mortgage. While they may offer real benefits, these ARMs may also cost more, or may add special features such as negative amortization.

## Interest-rate caps

An interest-rate cap places a limit on the amount your interest rate can increase. Interest caps come in two versions:

- Periodic caps, which limit the interest-rate increase from one adjustment period to the next; and
- Overall caps, which limit the interest-rate increase over the life of the loan.

By law, virtually all ARMs must have an overall cap. Many have a periodic cap.

Let's suppose you have an ARM with a periodic interest-rate cap of 2%. At the first adjustment, the index rate goes up 3%. The example shows what happens.

| ARM Interest Rate | Monthly Payment |
| --- | --- |
| 1st year @ 10% | $ 570.42 |
| 2nd year @ 13% (without cap) | $ 717.12 |
| 2nd year @ 12% (with cap) | $ 667.30 |

Difference in 2nd year between payment with cap and payment without = $ 49.82

Consumer Handbook on Adjustable Rate Mortgages (ARM)  |  11

A drop in interest rates does not always lead to a drop in monthly payments. In fact, with some ARMs that have interest-rate caps, your payment amount may increase even though the index rate has stayed the same or declined. This may happen when an interest rate cap has been holding your interest rate down below the sum of the index plus margin. If a rate cap holds down your interest rate, increases to the index that were not imposed because of the cap may carry over to future rate adjustments.

*With some ARMs, payments may increase even if the index rate stays the same or declines.*

The following example shows how carryovers work. The index increased 3% during the first year. Because this ARM limits rate increases to 2% at any one time, the rate is adjusted by only 2%, to 12% for the second year. However, the remaining 1% increase in the index carries over to the next time the lender can adjust rates. So when the lender adjusts the interest rate for the third year, the rate increases 1%, to 13%, even though there is no change in the index during the second year.

| ARM Interest Rate | Monthly Payment |
| --- | --- |
| 1st year @ 10% | $ 570.42 |
| If index rises 3% . . . 2nd year @ 12% (with 2% rate cap) | $ 667.30 |
| If index stays the same for the 3rd year @ 12% | $ 716.56 |
| Even though the index stays the same in 3rd year, payment goes up | $ 49.26 |

In general, the rate on your loan can go up at any scheduled adjustment date when the lender's standard ARM rate (the index plus the margin) is higher than the rate you are paying before that adjustment.

The next example shows how a 5% overall rate cap would affect your loan.

| ARM Interest Rate | Monthly payment |
|---|---|
| 1st year @ 10% | $ 570.42 |
| 10th year @ 15% (with cap) | $ 815.00 |

Let's say that the index rate increases 1% in each of the next nine years. With a 5% overall cap, your payment would never exceed $813.20—compared to the 1,008.64 that it would have reached in the tenth year based on a 19% interest rate.

## Payment caps

Some ARMs include payment caps, which limit your monthly payment increase at the time of each adjustment, usually to a percentage of the previous payment. In other words, with a 7½% payment cap, a payment of $100 could increase to no more than $107.50 in the first adjustment period, and to no more than $115.56 in the second.

Let's assume that your rate changes in the first year by 2 per-centage points but your payments can increase by no more than 7½% in any one year.

Here's what your payments would look like:

| ARM Interest Rate | Monthly Payment |
| --- | --- |
| 1st year @ 10% | $570.42 |
| 2nd year @ 12% (without payment cap) | $667.30 |
| 2nd year @ 12% (with 7 ½ % payment cap) | $613.20 |
| Difference in monthly payment = | $54.10 |

Many ARMs with payment caps do not have periodic interest-rate caps.

## Negative amortization

If your ARM includes a payment cap, be sure to find out about "negative amortization." Negative amortization means that the mortgage balance increases. It occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage.

Because payment caps limit only the amount of payment increases, and not interest-rate increases, payments sometimes do not cover all the interest due on your loan. This means that the interest shortage in your payment is automatically added to your debt, and interest may be charged on that amount. You might therefore owe the lender more later in the loan term than you did at the start. However, an increase in the value of your home may make up for the increase in what you owe.

The next illustration uses the figures from the preceding example to show how negative amortization works during one year. Your first 12 payments of $570.42, based on a 10% interest rate, paid the balance down to $64,638.72 at the end of the first year.

The rate goes up to 12% in the second year. But because of the 7½% payment cap, your payments are not high enough to cover all the interest. The interest shortage is added to your debt (with

---

Beginning loan amount = $ 65,000

Loan amount at end of 1st year =
$ 64,638.72

Negative amortization during 2nd year =
$ 420.90

Loan amount at end of 2nd year =
$ 65,059.62 ($ 64,638.72 + $ 420.90)

(If you sold your house at this point, you would owe almost $60 more than you originally borrowed.)

---

interest on it), which produces negative amortization of $420.50 during the second year.

To sum up, the payment cap limits the increases in your monthly payment by deferring some of the increase in interest. Even-tually, you will have to repay the higher remaining loan balance at the ARM rate then in effect. When this happens, there may be a substantial increase in your monthly payment.

Some mortgages include a cap on negative amortization. The cap typically limits the total amount you can owe to 125% of the original loan amount. When that point is reached, monthly payments may be set to fully repay the loan over the remain-ing term, and your payment cap may not apply. You may limit negative amortization by voluntarily increasing your monthly payment.

Be sure to discuss negative amortization with the lender to understand how it will apply to your loan.

## Prepayment and conversion

If you get an ARM and your financial circumstances change, you may decide that you don't want to risk any further changes in the interest rate and payment amount. When you are con-sidering an ARM, ask for information about prepayment and conversion.

Prepayment: Some agreements may require you to pay special fees or penalties if you pay off the ARM early. Many ARMs allow you to pay the loan in full or in part without penalty whenever the rate is adjusted. Prepayment details are sometimes negotiable. If so, you may want to negotiate for no penalty, or for as low a penalty as possible.

**Conversion.** Your agreement with the lender may include a clause that lets you convert the ARM to a fixed-rate mortgage at designated times. When you convert, the new rate is generally set at the current market rate for fixed-rate mortgages.

The interest rate or up-front fees may be somewhat higher for a convertible ARM. Also, a convertible ARM may require a special fee at the time of conversion.

# Where to Get Information

Before you actually apply for a loan and pay a fee, ask for all the information the lender has on the loan you are considering. It is important that you understand index rates, margins, caps, and other ARM features such as negative amortization. You can get helpful information from advertisements and disclosures, which are subject to certain federal standards.

## Advertising

Your first information about mortgages probably will come from newspaper advertisements placed by builders, real estate brokers, and lenders. Although this information can be helpful, keep in mind that the ads are designed to make the mortgage look as attractive as possible. These ads may play up low initial interest rates and monthly payments, without emphasizing that those rates and payments later could increase substantially. So get all the facts.

A federal law, the Truth in Lending Act, requires mortgage advertisers, once they begin advertising specific terms, to give further information on the loan. For example, if they want to show the interest rate or payment amount on the loan, they must also tell you the annual percentage rate (APR) and whether that rate may go up. The APR, the cost of your credit as a yearly rate, reflects more than just a low initial rate. It takes into account interest, points paid on the loan, any loan origination fee, and any mortgage insurance premiums you may have to pay.

*Ads may play up low initial rates.*
*Get all the facts.*

## Disclosures from lenders

Federal law requires the lender to give you information about ARMs, in most cases before you apply for a loan. The lender also is required to give you information when you apply for a mortgage. You should get a written summary of important terms and costs of the loan. Some of these are the finance charge, the APR, and the payment terms.

*Read information from lenders — and
ask questions — before committing yourself.*

Selecting a mortgage may be the most important financial decision you will make, and you are entitled to all the information you need to make the right decision. Don't hesitate to ask questions about ARM features when you talk to lenders, real estate brokers, sellers, and your attorney, and keep asking until you get clear and complete answers. The checklist at the back of this booklet is intended to help you compare terms on different loans.

# Glossary

## Adjustable-rate mortgage (ARM)

A mortgage for which the interest rate is not fixed, but changes during the life of the loan in line with movements in an index rate. You may also see ARMs referred to as AMLs (adjustable-mortgage loans) or VRMs (variable-rate mortgages).

## Annual percentage rate (APR)

A measure of the cost of credit, expressed as a yearly rate. It includes interest as well as other charges. Because all lenders follow the same rules when calculating the APR, it provides consumers with a good basis for comparing the cost of loans, including mortgages.

## Buydown

With a buydown, the seller pays an amount to the lender so that the lender can give you a lower rate and lower payments, usually for an early period in an ARM. The seller may increase the sales price to cover the cost of the buydown. Buydowns can occur in all types of mortgages, not just ARMs.

## Cap

A limit on how much the interest rate or the monthly payment may change, either at each adjustment or during the life of the mortgage. Payment caps don't limit the amount of interest the lender is earning, so they may cause negative amortization.

## Conversion clause

A provision in some ARMs that allows you to change the ARM to a fixed-rate loan at some point during the term. Conversion is usually allowed at the end of the first adjustment period. At the time of the conversion, the new fixed rate is generally set at one of the rates then prevailing for fixed-rate mortgages. The conversion feature may be available at extra cost.

## Discount

In an ARM with an initial rate discount, the lender gives up a number of percentage points in interest to give you a lower rate and lower payments for part of the mortgage term (usually for one year or less). After the discount period, the ARM rate will probably go up depending on the index rate.

## Index

The index is the measure of interest-rate changes that the lender uses to decide how much the interest rate on an ARM will change over time. No one can be sure when an index rate will go up or down. To help you get an idea of how to compare different indexes, the following chart shows a few common indexes over an eleven-year period (1994-2004). As you can see, some index rates tend to be higher than others, and some more volatile. (But if a lender bases interest-rate adjustments on the average value of



SELECTED INDEX RATES FOR ARMS
OVER AN ELEVEN-YEAR PERIOD

an index over time, your interest rate would not be as volatile.)
You should ask your lender how the index for any ARM you are
considering has changed in recent years, and where the index is
reported.

## Margin

The number of percentage points the lender adds to the index
rate to calculate the ARM interest rate at each adjustment.

## Negative Amortization

Amortization means that monthly payments are large enough
to pay the interest and reduce the principal on your mortgage.
Negative amortization occurs when the monthly payments do
not cover all the interest cost. The interest cost that isn't covered
is added to the unpaid principal balance. This means that even
after making many payments, you could owe more than you did
at the beginning of the loan. Negative amortization can occur
when an ARM has a payment cap that results in monthly pay-
ments not high enough to cover the interest due.

## Points

One point is equal to 1 percent of the principal amount of your
mortgage. For example, if the mortgage is for $65,000, one point
equals $650. Lenders frequently charge points in both fixed-rate
and adjustable-rate mortgages in order to increase the yield on
the mortgage and to cover loan closing costs. These points usu-
ally are collected at closing and may be paid by the borrower or
the home seller, or may be split between them.

# Mortgage Checklist

*Ask your lender to help fill out this checklist!*

| | Mortgage A | Mortgage B |
|---|---|---|
| Mortgage amount | | |
| **Basic Features for Comparison** | | |
| Fixed-rate annual percentage rate (the cost of your credit as a yearly rate, including both interest and other charges) | | |
| ARM annual percentage rate | | |
| Adjustment period | | |
| Index used and current rate | | |
| Margin | | |
| Initial payment without discount | | |
| Initial payment with discount (if any) | | |
| How long will discount last? | | |
| Interest-rate caps: | | |
| periodic | | |
| overall | | |
| Payment caps | | |
| Negative amortization | | |
| Convertibility or prepayment privilege | | |
| Initial fees and charges | | |

|  | Mortgage A | Mortgage B |
|---|---|---|
| Mortgage amount | _____ | _____ |

**Monthly Payment Amounts**

What will my monthly payment be after 12 months if the index rate:

| stays the same | _____ | _____ |
|---|---|---|
| goes up 2% | _____ | _____ |
| goes down 2% | _____ | _____ |

What will my monthly payment be after 3 years if the index rate:

| stays the same | _____ | _____ |
|---|---|---|
| goes up 2% per year | _____ | _____ |
| goes down 2% per year | _____ | _____ |

Take into account any caps on your mortgage and remember that it may run 30 years.

This booklet was originally prepared in consultation with the following organizations:

American Bankers Association

America's Community Bankers
(formerly the National Council of Savings Institutions and the U.S. League of Savings Institutions)

Comptroller of the Currency

Consumer Federation of America

Credit Union National Association, Inc.

Federal Deposit Insurance Corporation

Federal Reserve Board's Consumer Advisory Council

Federal Trade Commission

Independent Bankers Association of America

Mortgage Bankers Association of America

Mortgage Insurance Companies of America

National Association of Federal Credit Unions

National Association of Home Builders

National Association of Realtors

National Credit Union Administration

Office of Special Advisor to the President for Consumer Affairs

The Consumer Bankers Association

U.S. Department of Housing and Urban Development

*With special thanks to Fannie Mae and Freddie Mac.*

Revised 2005. Reprinted May 2006. 10/2000

# EXHIBIT I

# NOTICE OF RIGHT TO CANCEL

4618 W. Dickens Avenue
Chicago, IL 60639

LOAN NO. 2006001231

(Identification of Transaction)

## Your Right to Cancel

You are entering into a transaction that will result in a mortgage, lien or security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) the date of this new transaction, which is    01/18/2006    ; or

(2) the date you received your new Truth in Lending disclosures; or

(3) the date you received this notice of your right to cancel.

If you cancel this new transaction, it will not affect any amount that you presently owe. Your home is the security for that amount. Within 20 calendar days after we receive your notice of cancellation of this new transaction, we must take any steps necessary to reflect the fact that your home does not secure the increase of credit. We must also return any money or property you have given to us or anyone else in connection with this new transaction.

You may keep any money we have given you in this new transaction until we have done the things mentioned above, but you must then offer to return the money at the address below. If we do not take possession of the money within 20 calendar days of your offer, you may keep it without further obligation.

## How to Cancel

If you decide to cancel this new transaction, you may do so by notifying us in writing, at:

Capital One Home Loans, LLC
7311 W. 132nd Street Ste 300
Overland Park, KS 66213

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of    01/21/2006
(Date)
(or midnight of the third business day following (the latest of the three events listed above)). If you send or deliver your written notice to cancel some other way, if must be delivered to the above address no later than that time.

## I WISH TO CANCEL

_____    _____
Consumer's Signature                              Date

I Received Notice of Right to Cancel in Duplicate this Date    January 18    2006

X _____    _____    X _____    _____
Borrower  Ivellisse Rodriguez    (Date)        Wilfredo Rodriguez    (Date)

# EXHIBIT 1

01/18/2008 01:22 FAX CAPITALONE SETTLEMENT 007/012

Loan Number2006001231

**SCHEDULE "A"**
**PREPAYMENT PENALTY NOTE RIDER**

THIS PREPAYMENT PENALTY NOTE RIDER ("Rider") is made this 18th day of January, 2006 and is incorporated into and shall be deemed to amend and supplement a Note in the amount of $ 351,000.00 dated an even date herewith, executed by the undersigned ("Borrower") to ("Lender") secured by a Mortgage, Deed of Trust or Deed to Secure Debt ("Security Instrument") dated an even date herewith.

In addition to the agreements and provisions made in said Note, both Borrower and Lender further agree as follows:

Any provisions of said Note, or other such instruments executed in connection with said indebtedness which are inconsistent with the provisions of this Rider, including, but not limited to, monthly payments of principal and interest, maturity date and notice to the Borrower are hereby amended or negated to the extent necessary to conform such instruments to the provisions of this Rider.

The final Note payment shall be due and payable on February 1, 2036

The following notice is given to the Borrower as part of this loan contract pursuant to Federal regulations:

PROVISIONS FOR PREPAYMENT PENALTY:

Consecutive monthly principal and interest installments of $ 2,632.21 first due on the 1st day of March, 2006. Such payments to continue until maturity when the remaining principal balance and any unpaid interest thereon shall be due and payable. In the event full prepayment is made within three (3) years of the date of the first monthly payment a prepayment penalty in the amount of six (6) months interest on the remaining principal balance will be assessed.

IN WITNESS WHEREOF, Borrower has executed this Prepayment Penalty Note Rider.

Ivelisse Rodriguez

Wilfredo Rodriguez

[redacted]

Prepayment Penalty (Rider)

EXHIBIT K

Date 03/03/06

Loan No.2006001231

# NOTICE OF ASSIGNMENT, SALE, OR TRANSFER
# OF SERVICING RIGHTS *

In accordance with Section 6 of Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605) you are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, has been assigned, sold or transferred from Capital One Home Loans, LLC

(Transferor) to HSBC Mortgage Services
(Transferee).

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the security instruments, other than terms directly related to the servicing of your loan.

The effective date of this notice is 02/15/06

TRANSFEROR SERVICER - The name of an individual employed by Capital One Home Loans, LLC or a department where you may direct inquiries related to the transfer of the servicing rights of your mortgage is THE CUSTOMER SERVICE DEPARTMENT and the toll-free or collect call telephone number is (888) 718-4488

TRANSFEREE SERVICER - The name of an individual employed by HSBC Mortgage Services new servicer or a department where you may direct inquiries related to the transfer of the servicing rights of your mortgage loan is CUSTOMER SERVICE DEPARTMENT and the toll-free or collect call telephone number is (800) 333-7023

The date on which Capital One Home Loans, LLC and the date that HSBC Mortgage Services will stop accepting payments on your mortgage loan is 03/02/06
the transferee, will begin accepting your payments on 03/03/06

The transfer of servicing rights may affect the terms of the continued availability of mortgage life or disability insurance or any other type of option insurance in the following manner:

You should take the following action to maintain coverage:

You should also be aware of the following information, which is set out in Section 6 of RESPA:

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by the original mortgage lender or a timely fashion may not be treated by the new loan servicer as late, and a late fee may not be imposed on you. If a mortgage loan servicer receives a qualified written request (as defined in Section 6 of RESPA) from a borrower for information concerning the servicing of the loan, the servicer must provide the borrower with a written response within 20 days of receipt of the request. Not later than 60 days after receipt of the request, the servicer must make any appropriate corrections to the borrower's account, and must provide the borrower with a written clarification regarding any dispute. During this 60-day period, the servicer may not provide information concerning an overdue payment to a consumer reporting agency.

Whoever fails to comply with the requirements set out in Section 6 of RESPA shall be liable to individuals for actual damages and, in the case of a pattern of noncompliance, shall be liable for an additional amount not to exceed $1,000 per class member, not to exceed $500,000 or 1 % of the servicer's net worth, whichever is less. The court may also award attorneys' fees. A transferor or transferee of servicing shall not be liable under this section if, within 60 days of discovering an error, and before the commencement of an action and receipt of written notice of the error from the borrower, the servicer notifies the borrower of the error and makes whatever adjustment is necessary.

* (This notice must be delivered by the transferor servicer no less than 15 days before the effective date of the transfer of servicing rights, and must be sent by the transferee no more than 15 days after the transfer. Delivery means placing the notice in the mail, first class postage prepaid, prior to 15 days before the effective date of transfer or prior to 15 days after the effective date of transfer. However, this notice may be sent within 30 days of the effective date of transfer of servicing rights if transfer of servicing rights if assignment, sale or transfer of the contract for servicing the loan for cause, commencement of proceedings for bankruptcy of the servicer, or commencement of proceedings by the Federal Deposit Insurance Corporation (FDIC) or the Resolution Trust Corporation (RTC) for conservatorship or receivership of the servicer, or an entity by which the servicer is owned or controlled.)

EXHIBIT T

Date:     February 15, 2006

To:     Ivettise Rodriguez
         Wilfredo Rodriguez
         4618 W. Dickens Avenue
         Chicago         IL     60639

Re:   4618 W. Dickens Avenue
        Chicago, IL 60639

Dear Borrower(s),

We wish to advise you that effective _____March 3, 2006_____, the mortgage loan on
your property referenced above was sold to     HSBC Mortgage Services
*This company has acquired your mortgage in a normal business transaction that
does not affect the term or conditions of your loan.*

All future mortgage payments should be mailed to:

HSBC Mortgage Services

636 Grand Regency Boulevard
Brandon, FL 33510

All telephone inquiries should be directed to:

(800) 333-7023

You will soon receive instructions from     HSBC Mortgage Services
regarding the handling of future payments.  Until then, include with your payment
your existing loan number on your check and/or use the payment coupons enclosed.

In addition, please find enclosed a Notice of Assignment, Sale, or Transfer of Servicing Rights* for
you to retain for your loan document file.

Thank you for your consideration.  We hope that this transfer has not caused any confusion or
inconvenience for you.  We appreciate your business.  If we can be of any service to you in the future
with your mortgage needs please contact our office and we will be happy to discuss them with you.

Sincerely,

Post Closing Department

EXHIBIT M

**LAW OFFICES OF AL HOFELD, JR., LLC**
**208 S. LaSalle Street, Suite #1650**
**Chicago, Illinois 60604**
**Phone - 312-345-1004**
**Fax - 312-346-3242 (FAX)**
**Email: al@alhofeldlaw.com**

March 22, 2008

**BY REGULAR MAIL**

Capital One Home Loans, LLC
7311 West 132nd Street, Suite 300
Overland Park, Kansas, 66213

HSBC Mortgage Services, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Mortgage Electronic Registration Systems, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Re:   Notice of TILA rescission, claim and lien for Ivelisse and Wilfredo
Rodriguez, 4618 West Dickens Avenue, Chicago, Illinois, 60439;
loan of January 18, 2006, originated by Capital One Home Loans.

Ladies/Gentlemen:

The above clients hereby give notice that they rescind the above loan for
noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above client to file the suit
against you and that we claim a lien upon said recovery for 1/3 of such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the
owner pursuant to your obligation under 15 U.S.C. §1641(f)(2).

Finally, please provide a complete account history so that we may compute the
appropriate tender amount.

Sincerely,

Al Hofeld, Jr.

Cc: clients

I, Al Hofeld, Jr., under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the listed addressees on March 22, 2008.

Al Hofeld, Jr

**LAW OFFICES OF AL HOFELD, JR., LLC**
**208 S. LaSalle Street, Suite #1650**
**Chicago, Illinois 60604**
**Phone - 312-345-1004**
**Fax - 312-346-3242 (FAX)**
**Email:  al@alhofeldlaw.com**

March 22, 2008

**BY REGULAR MAIL**

Capital One Home Loans, LLC
7311 West 132nd Street, Suite 300
Overland Park, Kansas, 66213

HSBC Mortgage Services, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Mortgage Electronic Registration Systems, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Re:    Notice of TILA rescission, claim and lien for Ivelisse and Wilfredo
       Rodriguez, 4618 West Dickens Avenue, Chicago, Illinois, 60639,
       loan of January 18, 2006, originated by Capital One Home Loans

Ladies/Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above client to file suit against you and that we claim a lien upon said recovery for 1/3 of such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to your obligation under 15 U.S.C. §1641(f)(2).

Finally, please provide a complete account history so that we may compute the appropriate tender amount.

2

Sincerely,

A. Holland, Jr.

Cc:   clients

I, Al Hofeld, Jr., under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the listed addressees on March 22, 2008.

Al Hofeld, Jr

**LAW OFFICES OF AL HOFELD, JR., LLC**
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - 312-345-1004
Fax - 312-346-3242 (FAX)
Email: al@alhofeldlaw.com

March 22, 2008

**BY REGULAR MAIL**

Capital One Home Loans, LLC
7311 West 132nd Street, Suite 300
Overland Park, Kansas, 66213

HSBC Mortgage Services, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Mortgage Electronic Registration Systems, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, IL 60604

Re:   Notice of TILA rescission, claim and lien for Ivelisse and Wilfredo Rodriguez, 4618 West Dickens Avenue, Chicago, Illinois, 60439, loan of January 18, 2006, originated by Capital One Home Loans

Ladies/Gentlemen:

The above clients hereby give notice that they rescind the above loan for noncompliance with the Truth in Lending Act.

Please be further advised that we have been retained by the above client to file suit against you and that we claim a lien upon said recovery for 1/3 of such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to your obligation under 15 U.S.C. §1641(f)(2).

Finally, please provide a complete account history so that we may compute the appropriate tender amount.

1

Sincerely,



Al Hofeld, Jr.

Cc:   clients

2

I, Al Hofeld, Jr., under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the listed addressees on March 22, 2008.

Al Hofeld, Jr